IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.  14-cv-01866-WYD

HOLLY LYNN MANN,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

      Defendant.

---

## ORDER

---

THIS MATTER is before the Court on review of the Commissioner's decision that

denied Plaintiff's application for disability insurance benefits ["DIB"] under the Social

Security Act ["the Act"].  For the reasons stated below, this case is reversed and

remanded to the Commissioner for further fact finding.

I.    <u>BACKGROUND</u>

In April 2011, Plaintiff filed an application for DIB alleging disability beginning in

June 2005.  (ECF No. 10, Administrative Record ["AR"]  213-16.)  Plaintiff, born in 1972,

was 32 on the date of alleged disability onset in June 2005 and 35 on her June 2008

date last insured ["DLI"].  (*Id.* 16, 213.)  She attended two years of college and worked

in the relevant past as an office manager (Tr. 243).

When she applied for DIB in April 2011, Plaintiff claimed disability due to various

medical conditions including systemic lupus erythematosus ["SLE" or "lupus"], arthritis,

and pelvic complaints.  (AR 242.)  Reported symptoms included joint and muscle pain, muscle weakness, fatigue, and skin and light sensitivity.

Plaintiff's claim was initially denied on July 7, 2011 (AR 101), and she requested a hearing.  (*Id.* 104.)  In a decision dated January 25, 2013 (*id.* 11-23), the ALJ found that Plaintiff was not disabled as defined in the Act.

More specifically, in the sequential evaluation process required by law, the ALJ found at step one that Plaintiff had worked since her onset date, but that this work did not rise to the level of substantial gainful activity and therefore did not preclude her disability claim.  (AR 16.)  At steps two and three, the ALJ found that Plaintiff had severe impairments of fibromyalgia, myopathy and myofascial pain syndrome, but that such impairments did not meet or medically equal the severity of one of the listed impairments.  (*Id.* 16-17.)  The ALJ found that lupus was not a medically determinable impairment prior to Plaintiff's DLI of June 30, 2008.  (*Id.*)

As to Plaintiff's residual functional capacity ["RFC"], the ALJ found that she could perform light level work with the following limitations:  avoid concentrated exposure to extreme cold and extreme heat; avoid unprotected heights, moving machinery, ultraviolet light, and sunlight; and no climbing of ladders, ropes, or scaffolds. (AR 18.)  At step four, the ALJ determined that Plaintiff could perform her past relevant work as an office manager, and denied the claim.  (AR 22.)  Thus, the ALJ did not reach step five.

The Appeals Council declined Plaintiff's request for review (AR 1-5), making the ALJ's decision the final decision for purposes of judicial review.  20 C.F.R. § 422.210.

Plaintiff argues that the ALJ failed to articulate sufficient reasons based on substantial evidence to support his decision to give little weight to treating physician Dr. Korman's opinion.  She asserts that the Appeals Council compounded this error by failing to remand based on Dr. Korman's supplemental report.  Plaintiff also argues that the ALJ's credibility finding was not based on substantial evidence.  As a result of these errors, Plaintiff argues that the RFC determination is not consistent with governing law and is not supported by substantial evidence.

II.   ANALYSIS

A.   Standard of Review

A Court's review of the determination that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence.  *Hamilton v. Sec. of Health and Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992).  Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion.  *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990).  "It requires more than a scintilla of evidence but less than a preponderance of the evidence."  *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988).  The court must "'meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met.'"  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (quoting *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005)).

"Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  "[I]f the ALJ failed to apply the correct legal test, there is a ground for reversal apart from substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).  However, the court "must 'exercise common sense' in reviewing an ALJ's decision and must not 'insist on technical perfection.'" *Jones v. Colvin*, 514 F. App'x 813, 823 (10th Cir. 2013) (quotation omitted).  Further, in reviewing the record to make the substantial evidence determination, the court may not reweigh the evidence nor substitute its judgment for that of the Commissioner's.  *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994).

      B.     <u>Plaintiff's Arguments</u>

           1.     <u>Treating Physician Dr. Korman</u>

Dr. Korman is Plaintiff's treating rheumatologist.  He first examined Plaintiff in June 2008, shortly before Plaintiff's DLI (AR 923), and continues to treat her. Dr. Korman opined in February 2012 that Plaintiff has lupus, and that Plaintiff showed signs and symptoms of this diagnosis prior to her DLI.  (*Id.*)  He opined that Plaintiff had organ or body system involvement to at least a moderate degree in regard to neurologic, mental, skin and multiple joint arthralgias.  (*Id.*)  He further opined that during the time period before her DLI, Plaintiff had moderate limitations with activities of daily living, social functioning, and concentration, persistence of pace, and would have to avoid all exposure to sunlight and ultraviolet.  Further, her condition would cause her to be off task 10% of the time, might cause her to be absent from work up to four times

per month, that she might only be able to work 6 hours per day, and that she probably would need unscheduled breaks depending on the day for up to an hour during which she would probably need to lie down.  (*Id.* 924-925.)  The vocational expert testified that these limitations would eliminate all employment.  (*Id.* 75-76.)

Plaintiff first argues that Dr. Korman's opinion supports a finding that her lupus symptoms met or medically equaled Listing 14.02, and that this condition began before her DLI of June 30, 2008.  (AR 922-925.)  A disability claim is granted at step three if the claimant has an impairment that meets or medically equals a "Listing" found in 20 C.F.R. §404, Subpart P, Appendix 1.  The claimant bears the burden to prove her impairment(s) meets or equals a listing.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

Listing 14.02(A) requires a diagnosis of lupus/SLE with involvement of two or more body systems, one to at least a moderate level of severity, and at least two constitutional symptoms or signs (i.e., severe fatigue, fever, malaise, or involuntary weight loss).  Dr. Korman's report indicates that Plaintiff's neurologic, mental, skin, and musculoskeletal systems were involved to at least a moderate level of severity; and that she had severe fatigue.  (AR 923.)  I agree with the Commissioner that Dr. Korman's opinion is inadequate, however, to establish that Plaintiff met or equaled Listing 14.02A, because it does not address all of the specified medical criteria.  Specifically, Dr. Korman opined that Plaintiff had only one constitutional symptom or sign—fatigue. (*Id.*)  Although explicitly asked whether Plaintiff had involuntary weight loss, fever, or

malaise on or before her June 2008 DLI, Dr. Korman did not indicate that these signs or symptoms were present.  (*Id.*)

Plaintiff also argues, however, that the ALJ erred in his treatment of Dr. Korman's opinion in regard to her lupus diagnosis and RFC by not following the treating physician rule.  The ALJ chose to give "little weight" to Dr. Korman's diagnosis of lupus and functional limitations related to same, instead relying on the testimony of non-examining medical expert Dr. Brown who testified at the hearing.  (AR 21.) Dr. Brown testified that he did not concur with Dr. Korman's opinion, and that Plaintiff did not have lupus. (*Id.* 20-21.)  He testified instead that the medical evidence demonstrated a myofascial pain disorder or fibromyalgia and a "less than mild autoimmune dysfunction."  (*Id.*)  He also opined to the RFC ultimately adopted by the ALJ.  (*Id.* 21.)

I agree with Plaintiff that the ALJ erred as he did not follow the proper legal standard for evaluating a treating physician's opinion.  The initial determination the ALJ must make is whether the treating physician's medical opinion "is conclusive, i.e., is to be accorded 'controlling weight,' on the matter to which it relates."  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).  "Such an opinion must be given controlling weight if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."  *Id.*

Here, the ALJ did not acknowledge that Dr. Korman was a treating physician nor state why he was not giving controlling weight to Dr. Korman's opinion.  This was error. *See  Watkins v. Barnhart* 350 F.2d 1297, 1301 (10th Cir. 2003).  Even if Dr. Korman's

opinion was not entitled to controlling weight, it was entitled to deference. "[A]t the second step in the analysis, the ALJ must make clear how much weight the opinion is being given. . . and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330.[1]  There is no indication that the ALJ gave deference to Dr. Korman's opinion, as required, or considered the relevant factors. This is also reversible error. *Watkins*, 350 F.3d at 1300. The fact that the ALJ found Dr. Brown's testimony at the hearing "more persuasive" (AR 21) does not allow him to disregard the requirements of the treating physician rule.

The Commissioner argues, however, that the ALJ found that Dr. Korman's opinion was not well-supported or consistent with other record evidence. (AR 21.) Thus, the Commissioner asserts that "it is readily apparent that the ALJ did not give Dr. Korman's opinion controlling weight for reasons that comport with Section 404.1527(c)(2), and the ALJ's discussion was sufficiently specific for the Court's review." (Resp. Br. at 20-21) (citing SSR 96-2p, 1996 WL 374188, at *5) (an ALJ's decision need only "be sufficiently specific to make clear to any subsequent reviewer the weight the adjudicator gave to the treating source's opinion and the reasons for that

---

[1] As summarized in *Watkins,* the regulatory factors are (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Id.* at 1301.

weight"); *Kruse v. Astrue*, 436 F. App'x 879, 882-83 (10th Cir. 2011) (unpublished) (affirming, although the ALJ did not meet all of the *Krauser* articulation requirements, where the ALJ's analysis was sufficiently specific for the court's review)).

I do not find it "readily apparent" that the ALJ decided Dr. Korman's opinion was not entitled to controlling weight based on a valid reason; *i.e.*, the ALJ did not specifically address whether the opinion was well-supported by medically acceptable clinical or laboratory diagnostic techniques or whether it was inconsistent with other substantial evidence in the record.  Instead, he gave "little weight" to the opinion, rejecting the lupus diagnosis and RFC assessment because it was "inconsistent" with Dr. Korman's "treatment notes and the objective medical findings".  (AR 21.)  This is not the proper standard for determining whether to give a treating physician's opinion controlling weight.

Moreover, the ALJ's reason for rejecting Dr. Korman's opinion; namely, that his notes did not indicate any "significant neurological deficits or mental health issues" before the DLI, does not appear to be supported by substantial evidence.  (AR 21.)  As Plaintiff asserts in her reply brief, this finding does not take into account that Dr. Korman indicated in a letter to Dr. Hillburn documenting his initial visit with Plaintiff on June 27, 2008, that Plaintiff had neurologic problems such as paresthesias which had been occurring for several years, diffuse body pain, prolonged hospitalization with bed rest due to pregnancy, burning midepigastric pain radiating to her back which started 7 weeks before this visit, and sensitivity on the right flank and in the triceps area. Further, on exam he noted a rash consistent with lupus.  (AR 414.)

Moreover, there is no indication that the ALJ considered the other required factors, such as the fact that Dr. Korman had actually examined and treated Plaintiff and had empirically determined that her condition was, in fact, lupus; the length of time Dr. Korman had been treating her and his specialty; the location, duration, and frequency of Plaintiff's pain or other symptoms; factors that precipitate and aggravate the symptoms; and the type, dosage, effectiveness, and side effects of any medication Plaintiff takes or has taken to alleviate pain or other symptoms. *See Andersen v. Astrue*, 319 F. App'x 712, 722-23 (10th Cir. 2009) (noting that consideration of the supportability factor alone is insufficient, because "[a]lthough supportability might prove determinative, that can only be decided after consideration of the other factors"; and stating that "the ALJ's cursory treatment of the physician's opinions. . . does not satisfy us that the ALJ *considered* all the relevant factors") (emphasis in original). The fact that when Dr. Korman first saw Plaintiff he initially thought the problem may be fibromyalgia and that there "was no clear etiology" and a lack of "concrete objective medical evidence to work with" (AR 17) does not allow the ALJ to reject Dr. Korman's later conclusion after further treatment and assessment that Plaintiff did in fact have lupus during the relevant time period. *See Winfrey v. Chater*, 92 F.3d 1017, 1021-22 (10th Cir. 1996) (the ALJ is not entitled to reject a doctor's opinions without adequate justification or to substitute his own medical judgment for that of the doctor).

I also agree with Plaintiff that Dr. Korman's opinions were not, as the Commissioner argues, unsubstantiated. Instead, Plaintiff was observed by multiple medical providers, including Dr. Korman, to be suffering from various rashes that are

indicative of lupus, *e.g.*, a "malar" or "butterfly" rash.  (*Id.* 720, 757, 713, 709.)  Plaintiff

also had ongoing and consistent complaints of joint pain, muscle pain, skin sensitivity,

light sensitivity, weakness and fatigue.  (*See, e.g.*, 411, 414.)  While her ANA tests were

negative, her  "double stranded DNA" tests were borderline positive in July 2008.  (*Id.*

422.)  Finally, Plaintiff improved when she was treated with lupus-directed medications.

(*Id.* 54.)  These issues were not properly taken into account by the ALJ.

Based on the foregoing, I find that a remand is required.  On remand, the ALJ is

instructed not only to follow the two-step analysis in deciding what weight to give

treating physician Dr. Korman's opinion, he must also reassess his finding at step two

that Plaintiff's lupus was not a severe impairment.  *See Langley v. Barnhart*, 373 F.3d

1116, 1123 (10th Cir.2004) (a claimant need only make a "de minimus" showing of

impairment to move on to further steps in the analysis).  He must also consider the

combined effect of Plaintiff's impairments, even if they are not found to be severe.

*Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013).

The ALJ is also instructed on remand to consider the letter from Dr. Korman that

was submitted to the Appeals Council.  (AR 1094.)  It explained that the diagnosis of

lupus was substantiated despite the lack of a positive ANA test.  This is significant in

that it contradicted Dr. Brown's testimony that Plaintiff's lupus diagnosis was not

supported in part because of the negative ANA test.  The error in properly weighing

Dr. Korman's opinion also may impact the ALJ's decision to give weight to the opinion of

Dr. Brown.  Obviously, if the ALJ concludes that Dr. Korman's opinion should have

been given greater weight, he would not be justified in relying on the contrary opinion of Dr. Brown.

I also note that some of the other reasons given by the ALJ as a basis to reject the lupus diagnosis appear not to be supported and should be reassessed on remand. Thus, the ALJ rejected a lupus diagnosis because "the medical evidence. . . shows limited abnormal medical findings and no active hospitalizations." (AR 21.)  There is no evidence, however, that active hospitalizations are required for a lupus diagnosis.  As to the medical findings, Dr. Brown believed Plaintiff did not have lupus because the ANA test was negative, she did not have any joint swelling or end organ involvement, and her muscle and skin biopsies were negative. (*Id.*)  Plaintiff presents evidence, however, that these are not the definitive criteria for diagnosing lupus as defined by the American College of Rheumatologists' criteria.  Dr. Brown recognized this criteria and acknowledged that only four out of eleven of the recognized symptoms or findings need to be established for a lupus diagnosis. (*Id.* 50.)  The list does not require a positive ANA test, that is only one of the eleven possible criteria.[2]  Plaintiff asserts that contrary to Dr. Brown's testimony, she had the requisite four designated symptoms and signs, including malar rash, photosensitivity, oral ulcers, non-erosive arthritis (in Plaintiff's case, arthralgias) in multiple joints, and significant degenerative disease in her cervical and lumbar spines, as well as one of the "other signs" common to lupus, including

---

[2] The fact that Plaintiff had a seronegative ANA test is also not dispositive because, as Dr. Brown himself stated, 5% of lupus patients never show a positive ANA test.  (*Id.* 55; *see also* 1094.)  Moreover, the fact that Plaintiff did not exhibit swollen joints is not dispositive under the criteria.

Raynaud's phenomena.[3]  She also consistently complained of fatigue and malaise.  This evidence was not properly considered, and Dr. Brown's testimony may not be factually supported.  Thus, a remand is also required in connection with this issue.

     B.    <u>Plaintiff's Credibility</u>

Finally, Plaintiff argues that the factors the ALJ cited in support of his credibility finding are either not based in substantial evidence or do not provide support for his credibility finding.  The ALJ found as to credibility that Plaintiff's testimony regarding her limitations "was not entirely credible", even though she "appeared sincere."  (AR 19.) He cited the "inconsistency" of her testimony with the medical evidence, finding that the inconsistency "cast doubt on the accuracy" of her testimony.  (*Id.* 20- 21.)

Turning to my analysis, "'[c]redibility determinations are peculiarly the province of the finder of fact", and the court should "not upset such determinations when supported by substantial evidence.'"  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Sec. of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)).  "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'"  *Kepler*, 898 F.2d at 777 (quotations omitted).  In the case at hand, I agree with Plaintiff that some of the supposed inconsistencies the ALJ relies on were not supported and/or the ALJ selectively applied the evidence which is improper.  *See Sisco v. U.S. Dep't of Health &*

---

[3] A full list of the signs and diagnostic criteria for lupus are found at the National Institutes of Health website at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0041704/.

*Human Servs.*, 10 F.3d 739, 742-43 (10th Cir. 1993); *Arrington v. Apfel*, No. 98-7099, 1999 WL 446013, at *8 (10th Cir. July 1, 1999) (unpublished).

First, the ALJ cites the fact that in March 2008 Plaintiff requested pain medication "because she was taking care of everybody except herself."  (AR 20, 656.)    The ALJ did not inquire at the hearing what was meant by "taking care of everyone" in this medical record.  That same medical record also noted, however, that medication was requested by Plaintiff "so that she can take care of her baby." (*Id.* 656.)  Plaintiff testified that this care was limited significantly, that she supervised her older child and took care of the baby from her bed while her husband was at work, using a wheeled dolly, in-room refrigerator, and had considerable assistance from her mother.  (AR 63-65.)  The medical records document the fact that her mother had to move from Florida to Colorado to help care for the children.  (*Id.* 411.)  Plaintiff also testified at the hearing that she was afraid to admit to medical providers at that point just how impaired she was, because she was afraid they would not take her seriously. (*Id.* 77-78.)  This evidence was not considered by the ALJ.

The ALJ also cites the fact that she did not complain of her symptoms "until June 2008", referring to her first visit with Dr. Korman.  (AR 21.)  Again, however, that is not accurate.  The record shows that in February 2008 she complained of joint pain (shoulder injury and pain, neck spasms), and an upper respiratory infection.  (*Id.* 738.)  In May 2008 she complained of possible "shingles" (i.e., rash) "c-spine" pain, and back pain to her primary care physician.  (*Id.* 737.)  Plaintiff's testimony was that she had experienced symptoms off and on, but more consistently and severely after the birth of

her second child in January 2008.  That was a difficult birth that resulted in a prolapsed uterus and other serious complications.  (*Id*. 815-840.)  While not directly related to her autoimmune disorder, the ALJ did not consider these conditions when evaluating her functional capacity.

Further, in July 2008, Plaintiff reported increased pain and weakness, stating she could hardly lift her leg and was in too much pain to make dinner.  (AR 430-31.)  When admitted to the hospital for extreme abdominal pain and arthralgias that same month (just a few days after the expiration of her insured status), she related the entire history, including her problems with functioning dating back at least eighteen months.  (*Id*. 755-756; *see also* 418.)  She said she was at her "wit's end", and that it was difficult to hold up her head or body out of bed.  (*Id*. 751, 755-59.)  While dated a few weeks after the DLI, these medical notes document the history of the condition dating back to well before that date and are thus not irrelevant.  Instead, the records appear to be significant evidence that support a retrospective diagnosis of lupus, per Dr. Korman's opinion, and are consistent with the history Dr. Korman took just a few days before the DLI.  The ALJ's finding that she did not report her problems with day-to-day functioning appears, therefore, to be factually incorrect and must be reassessed on remand.

The ALJ also cites a visit Plaintiff had with her pain management specialist, Dr. Leo, in December 2009, in which she reported no swelling and normal strength, and when she did exhibit swelling, "it was considered mild".  (AR 21—citing to "Ex. 5F/63", AR 617.)  That medical record appears, however, to corroborate Plaintiff's testimony in that Dr. Leo noted that she had to take a week to recover after the IgG treatment, and

that her pain had condensed into her pelvis and joints, primarily the hips, knees, shoulder, neck and back.  (*Id.* 616).  Although Dr. Leo noted that the pain was "better controlled", he stated that she still woke up stiff and painful in the morning.  Joint tenderness qualifies as a symptom of lupus, regardless of swelling.[4]  Moreover, a couple of months later, in February 2010, Dr. Leo characterized Plaintiff's swelling as "notable", stated her pain was rated as a 6.5/10, and found that she had tenderness in the shoulders, knees and hands.  (*Id.* 611.)  The ALJ selectively applied the evidence as to this issue.

Indeed, the ALJ appeared to selectively apply much of the medical evidence, stating the "objective medical evidence showed limited abnormalities".  (AR 20.)  It is undisputed, however, that all the medical providers agreed that Plaintiff had an autoimmune impairment (although they disagreed about what it was) that caused pain and other significant symptoms.  The pain, fatigue, and other symptoms that Plaintiff complained of had to be properly considered.  *See Carpenter v. Astrue*, 537 F.3d 1264, 1268 (10th Cir. 2008) (finding error with the ALJ's pain analysis because he not link his conclusions to the evidence or explain how the plaintiff's repeated attempts to find relief from pain, and the drugs she has been prescribed for pain, resulted in a conclusion that she is unlimited in any regard by pain); *Gatson v. Bowen*, 838 F.2d 442, 447 (10th Cir. 1988) ("objective medical evidence of disabling pain need not consist of concrete physiological data alone but can consist of a medical doctor's clinical assessment as well. . . ."); *Romero v. Astrue*, 242 F. App'x 536, 541 (10th Cir. 2007) (unpublished)

---

[4] *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0041704/.

(doctor's conclusions concerning Ms. Romero's pain and limitation. . . find support in the treatment records and therefore could not be cursorily dismissed for the reason the ALJ gave: lack of medical evidence).

The ALJ also cites the lack of any medical record showing that Plaintiff had to use a walker or cane, stay in bed all day, or crawl on the floor.  (AR 21.)  Again, this is factually incorrect.  In December 2008 Dr. Crosby noted that Plaintiff's could not get out of a chair or off the floor due to weakness.  (*Id.* 418.)  Also, when examining her in March 2010, Dr. Hammer (her urogyncologic surgeon) noted that she improved when walking with a cane.  (*Id.* 351.)  The fact that the ALJ found that Plaintiff's symptoms may have "improved by January 2009" (AR 20) is not relevant to Plaintiff's impairments as of her DLI of June 30, 2008.

It appears from the record that Plaintiff's statements regarding her daily activities have been consistent and are uncontradicted.  In her written submissions to the Commissioner, she identified substantially the same limitations as those she testified about at the hearing.  (AR 254-259, 274, 275.)  When she visited the emergency room in July 2008, she described being not safe at home because of the amount of pain she was in and her nausea and said she was at her "wit's end."  (*Id.* 751.)  Her pain and limitations were also substantiated in the medical records and in her testimony.  (*See, e.g.,* AR 755-56.)  Therefore, I agree that the ALJ's credibility finding is not based in substantial evidence.

The Tenth Circuit has noted that "[s]ince the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC

determinations are inherently intertwined. *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009). A new determination on credibility necessarily requires reassessment of the RFC. *Id.*

III.   <u>CONCLUSION</u>

Based upon the foregoing, it is

ORDERED that this case is **REVERSED AND REMANDED** for further fact finding as directed in this Order pursuant to sentence four in 42 U.S.C. § 405(g).

Dated: September 30, 2015

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge